**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Earline BROWN, Defendant-Appellant.**

**No. 82–1959.**

United States Court of Appeals,
Seventh Circuit.

Argued May 11, 1983.
Decided Aug. 31, 1983.

Maren Dougherty, Chicago, Ill., for defendant-appellant.

Ira H. Raphaelson, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUDAHY and POSNER, Circuit Judges, and ROSENN, Senior Circuit Judge.*

---

* The Honorable Max Rosenn, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

1. The defendant was indicted on four separate counts under 18 U.S.C. § 1711. The district court found the defendant not guilty on counts 1, 2, and 3, but guilty on count 4. Thus, only count 4 is relevant to this appeal.

> 18 U.S.C. § 1711 provides in relevant part:
> Whoever, being a . . . Postal Service officer or employee, loans, uses, pledges, hypothecates, or converts to his own use, or deposits in any bank, or exchanges for other funds or property, except as authorized by law, any money or property coming into his hands or under his control in any manner, in the execution or under color of his office, employment, or service, whether or not the same shall be the money or property of the United States;  or fails or refuses to remit to or deposit in the Treasury of the United States or in a designated depository, or to account for or turn over to the proper officer or agent, any such money or property, when required to do so by law or the regulations of the Postal Service, or upon demand or order of the Postal Service, either directly or through a duly authorized officer or agent, is guilty of embezzlement . . . .

ROSENN, Senior Circuit Judge.

Earline Brown, a former employee of the United States Postal Service, was convicted following a bench trial in the United States District Court on one count of an indictment alleging that she converted to her own use and failed to account for and turn over postal funds, in violation of 18 U.S.C. § 1711.[1] The trial court imposed on the defendant a fine of $394.18, the amount of the peculation, and sentenced her to a three year probationary period conditioned on participation in a work-release program for six months. She appeals her conviction on the ground that the district court's finding of guilt was not supported by the evidence. We vacate the judgment and remand for further proceedings.

## I.

Defendant Brown was employed by the United States Postal Service and its predecessor agency for over seventeen years. At the time of the events giving rise to the government's prosecution, she served as a window clerk and as chief stamp clerk at the Pilsen post office station in Chicago, Illinois. In this capacity she was responsible for maintaining the unit reserve, an inventory of stamps for the entire station. She also held the position of close out clerk, which required her to assemble each day's receipts and to prepare a consolidated report of all the day's business at the Pilsen station, including a report of her individual postal transactions.

Defendant's conviction arose out of a customer transaction she handled on July 7,

1981, involving the Dominican Fathers' Shrine of St. Jude Thaddeus (St. Jude's). An employee of St. Jude's, John Moore, tendered to defendant a check in the amount of $394.18 to pay for postage due mail received by St. Jude's. The government contends that defendant misappropriated a sum equal to the amount of this check.

As always, on appeal from a conviction, the evidence must be viewed in the light most favorable to the government, the prevailing party. The evidence presented at trial showed that on July 7, 1981, sometime between 9:30 A.M. and 11:00 A.M., John Moore went to the Pilsen station to pick up a load of business reply mail that the post office was holding for St. Jude's. A postal employee, Delores Aceves, was serving as postage due clerk that day. Moore gave Aceves the $394.18 check to pay the postage due, and Aceves began to prepare a receipt for St. Jude's as required by postal regulations. According to these regulations, this receipt was to be prepared by use of a postage meter capable of printing amounts in dollars and cents on a gummed label. The postal clerk would affix several of these labels to a Form 3582, as necessary to add up to the amount of the check, and would give the Form 3582 to the customer as a receipt. An internal counter would automatically record the meter usage, and each employee would be held accountable for his or her meter usage during a given day.

When Aceves began to prepare the receipt for St. Jude's, she realized that she was working that day with a meter that could only print meter strips up to $9.99. She determined that there would not be enough space on Form 3582 to affix the forty meter strips that would be necessary to issue St. Jude's a receipt in the amount of the check. Aceves testified that she asked defendant Brown for a longer version of Form 3582, but defendant responded that she did not know where the long forms were kept. Defendant then volunteered to prepare the receipt for St. Jude's herself since her meter could print meter strips up to $99.99, and thus only four meter strips

would be necessary to issue a receipt in the amount of $394.18. Accordingly, Aceves gave the St. Jude's check to the defendant, who put it in her drawer. A few minutes later, after Moore had left with the St. Jude's mail, Aceves asked defendant if she had given Moore his receipt. Defendant replied that she had not, but that Moore was returning later for the receipt. That afternoon, as she was about to leave the station for the day, Aceves again asked defendant about the St. Jude's receipt, and defendant said that she had taken care of it.

Early the next morning, Aceves went to the vault where the meters were kept, intending to use the $99.99 meter that day. She immediately noticed that the previous day's total was less than $15.00, and realized that defendant Brown could not possibly have used the meter to issue a receipt for the $394.18 St. Jude's transaction. Aceves asked Brown about the transaction, but defendant refused to provide any explanation, telling Aceves to call St. Jude's if she was concerned. Aceves then informed Pilsen post office station manager Oscar Washington about the incident. After talking to defendant Brown and inquiring with St. Jude's about the transaction, Washington was unsatisfied with defendant's explanation and he reported the incident to the postal inspectors. Postal Inspector James Hannah conducted an investigation in mid-July 1981 that resulted in defendant's indictment.

The government prosecuted defendant Brown on the theory that she had failed to issue a receipt to St. Jude's in order to conceal her pocketing of the amount of the check. Defendant's explanation for the transaction in question was that she did indeed issue a receipt to Moore, but a receipt containing ordinary postage stamps instead of meter strips. She claimed that, after having offered to prepare the St. Jude's receipt using the $99.99 meter, she discovered that the previous day's meter settings had not been verified by a supervisor. Because no supervisor was available to verify the meter setting at that time, she

stated that she was unable to use the meter. As a result, she claimed, she prepared a three page receipt for St. Jude's using $394.18 worth of ordinary postage stamps, which she cancelled by hand.[2] She then put the receipt in an envelope and gave it to Moore at about noon that day. The use of ordinary postage stamps would have been improper under postal regulations, as well as cumbersome and highly unusual.

There was considerable testimony, however, that cast serious doubt on defendant's explanation of the St. Jude's transaction. Moore testified that, although he believed he had received a receipt on the day in question, he was certain that he had never received one for postage due mail with cancelled stamps on it. Moreover, the next day St. Jude's was unable to locate the receipt defendant allegedly provided. All of the postage due receipts in St. Jude's possession bore meter strips rather than cancelled postage stamps. In addition, Inspector Hannah's audit of defendant's stamp account on July 16, 1981 revealed that she had twenty-eight more two dollar stamps in her stock than would have been possible if she had performed the July 7 St. Jude's transaction as she described. Finally, defendant predicated her explanation of the St. Jude's transaction on her inability to use the meter because it had not been validated, but supervisor William Hill testified that he always verified all the postal meters between 5:00 A.M. and 5:30 A.M. each day of his employment and could not recall ever verifying one later than that for defendant. Moreover, Hannah testified there were other employees who under the regulations could have verified the meter if in fact Hill was unavailable.

The district court found the defendant guilty of one count of conversion arising out of the July 7, 1981 St. Jude's transaction. In reaching this judgment, and in denying defendant's motion for judgment of acquittal, the district court issued no opinion, gave no statement of reasons, and made no specific findings.

## II.

Defendant contends that there was insufficient evidence to support her conviction under 18 U.S.C. § 1711. In evaluating defendant's argument on appeal, our review of the judgment is very narrowly circumscribed: we must uphold the conviction unless the evidence, viewed in the light most favorable to the verdict, could not have persuaded any rational trier of fact of the defendant's guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Fleming,* 677 F.2d 602, 609 (7th Cir.1982).

It is undisputed in this case that defendant did not give John Moore a standard meter receipt in return for the $394.18 check for the St. Jude's postage due mail, as postal regulations required. As a basic principle of accounting, when a postal employee accepts a check for postage due mail without tendering a receipt, this should result in an overage in the employee's account in the amount of the check. That is, the clerk would have accepted the check with no corresponding debit to the clerk's account. The government thus maintained at trial that defendant Brown, having failed to issue a receipt for the $394.18 St. Jude's transaction, must have removed cash (or stamps that she could resell for cash) in an amount equal to the St. Jude's transaction in order to avoid an overage at the time of her next audit. Apparently the district court concluded beyond a reasonable doubt that this was in fact what defendant had done.

---

**2.** Defendant claimed that she had prepared the receipt by taking one sheet of one dollar stamps and one sheet of two dollar stamps out of the unit reserve, and the remainder from her own window accountability. This would have required the application to the receipt and cancellation of in excess of 294 separate stamps.

Although she was supposed to complete a written form whenever she transferred stock between the unit reserve and her window accountability, there was testimony that employees at the Pilsen station often did not comply with this requirement.

There was no direct evidence in this case that defendant had pocketed the amount of the St. Jude's check. Conceivably, postal funds or stamps could disappear from an employee's drawer solely through the employees' mistake or oversight, or even as a result of theft by a customer or another employee. Thus, standing alone, evidence that defendant failed to issue the required receipt would be insufficient to establish criminal wrongdoing by the employee. *See United States v. Rodriguez,* 654 F.2d 315 (5th Cir.1981).

In this case, however, defendant Brown insisted that she had issued a receipt for the St. Jude's transaction. She claimed that she gave Moore a postage due receipt to which she affixed nearly 300 ordinary postage stamps, all cancelled by hand. Although this would have been in violation of post office regulations—as was her initial removal of stamps from the unit reserve without the required transfer form—there is nothing criminal about handling a postage due transaction in this irregular manner. But the district court reasonably refused to believe defendant's explanation in view of the considerable testimony demonstrating the implausibility of her story. John Moore testified that he never received a receipt containing cancelled postage stamps, and none of the receipts in St. Jude's possession contained hand-cancelled stamps. Moreover, Inspector Hannah's audit on July 16 revealed that defendant had twenty-eight more two dollar stamps in her

stock than would have been possible if she had performed the July 7 St. Jude's transaction as she claimed.[3] Finally, defendant's claim that she had to use ordinary postage stamps on the St. Jude's receipt because her meter had not been verified was seriously undermined by the testimony of Supervisor Hill. In view of this evidence offered by the government, the district court was justified in rejecting defendant's explanation of the St. Jude's transaction.

This does not end the matter, however. This prosecution was predicated upon the government's theory that defendant removed cash or stock in an amount offsetting the St. Jude's check. Lacking any direct evidence that defendant pocketed the amount of the check, the government had to prove as an essential element of its case that the defendant's accounts were in tolerance after the St. Jude's transaction. We have carefully combed the record and have been unable to find evidence of this crucial fact. Inspector Hannah testified concerning his audit on July 16, 1981, but his testimony only related to a stamp audit.[4] The defendant, however, served as a window clerk as well as chief stamp clerk and an audit of only her stamp account would be incomplete; it gave no consideration to her cash accountability.[5] We have also scrutinized prosecution Exhibit 5, to which the government referred us, but it shows only that defendant's accounts were in tolerance on June 18, 1981. The Exhibit does contain entries on August 25, 1981 that reflect a

---

3. Defendant testified that she received these extra stamps from other window clerks in return for cash. It was customary for clerks to trade cash for stamps among themselves without completing the required form for such transfers. Nevertheless, the district court was entitled to consider the discrepancy in defendant's stamp stock as evidence bearing on the truth of her story.

4. In this respect, Inspector Hannah testified:

    Q. Did you perform an audit of the amount of one dollar and two dollar stock available to Earline Brown from the locations she described obtaining it for the [July 7, 1981 St. Jude's] transaction?

    A. Yes, sir, I did.

    Q. Could you describe to the court what steps you took in that audit and your conclusion?

    A. I conducted an audit on July 16, 1981 during an interview of Earline Brown and made a physical count of the one dollar and two dollar stamps in her window accountability and in the unit reserve. I had her certify that my count was correct.

5. After this case was argued, we directed the prosecution, with notice to defendant, to supplement its brief to us by identifying "specific portions of the record establishing that the defendant's account was in balance (within tolerance) subsequent to the July 7, 1981 St. Jude's transaction." The prosecution duly responded but it was not helpful and the defendant offered no comment.

stamp audit of the defendant's reserve stock on that date, but there are no entries pertaining to July 1981 whatsoever. Thus, after carefully examining all of the testimony, the briefs, and prosecution Exhibit 5, we are unable to discover any evidence that the defendant's cash accounts (as distinguished from her stamp accounts) were audited within a few weeks of the St. Jude's transaction for the purpose of ascertaining whether her window accountability was balanced within tolerance.

■ We are also puzzled because the theory of the defense itself was that its accounts were in tolerance after the St. Jude's transaction.[6] In fact, in his written closing argument to the district court, defendant's counsel argued that:

> EARLINE BROWN had an audit on July 28, 1981. Her window accountability was $959.92 over and her chief stamp clerk (unit reserve) was $949.27 short. This comparison posted a shortage of $10.65. This was well within the acceptable range of tolerance for Ms. BROWN's accounts.

(Closing argument, p. 7). We find nothing in the record to support this assertion or other assertions of the defendant relating to tolerance after the St. Jude's transaction. In a criminal case where the defendant's liberty is at stake and the government has the burden of proving the defendant guilty beyond a reasonable doubt, we cannot substitute her counsel's statement in closing argument or briefs for critical evidence of guilt. We find nothing in prosecution's Exhibit 5 reflecting the audit of July 28, 1981. In fact, we can find no record or report of the audit of July 28, 1981.

■ Our review of this case has been severely hampered because the district court made no findings of fact. Rule 23(c) of the Federal Rules of Criminal Procedure does not require findings of fact unless they are requested, and apparently none were here. But in this complicated judge-tried case, predicated on circumstantial evidence

for proof of crime and dependent upon accounting procedures and audits for essential evidence, findings of fact by the trial court, even though not required, would have been helpful. In view of the state of the record in this case, they are indispensable "to proper appellate review of a conviction resulting from a non-jury trial." *United States v. Livingston,* 459 F.2d 797, 798 (3d Cir.1972). Regrettably, after the strain of an appeal, briefing, and argument, and our own laborious examination and re-examination of the record, we must vacate the judgment of conviction and return the case to the district court for findings. *See United States v. Conners,* 606 F.2d 269 (10th Cir.1979) (criminal case remanded to district court with specific direction to make findings).

On remand, the trial court is specifically directed to make written findings of fact, with supporting references to the record, as to whether all of the defendant's accounts were shown to be balanced within tolerance within a reasonable period after the St. Jude's transaction. These findings are to be based solely on the record created at defendant's trial. Should the trial court find that Earline Brown's accounts were shown to be in tolerance, then the trial court should enter a judgment of conviction. On the other hand, should the trial court find that the government has failed to prove that the defendant's accounts were in tolerance after the St. Jude's transaction, then her motion for judgment of acquittal should be granted. Accordingly, the case is remanded to the district court for further proceedings in accordance with this opinion. Each side to bear its own costs.

---

**6.** The defendant contended in her brief to this court, and reiterated at oral argument, that "an audit of her accountability conducted nine days after the transaction demonstrated that defend-ant's accounts were within tolerance" and that therefore there "is not a shred of evidence to support the government's theory of conversion."