**UNITED STATES of America, Plaintiff,**

v.

**Earline BROWN, Defendant.**

**No. 82 CR 139–1.**

United States District Court,
N.D. Illinois, E.D.

Aug. 31, 1984.

Ira H. Raphaelson, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff.

Maren Dougherty, Chicago, Ill., for defendant.

## FINDINGS OF FACT

GETZENDANNER, District Judge:

This case has been remanded by the Court of Appeals for entry of findings of fact to determine whether or not the defendant's accounts were shown to be balanced within tolerance within a reasonable period after the St. Jude's transaction. *United States v. Earline Brown,* 716 F.2d 457, 462 (7th Cir.1983). If the finding is that the accounts were in tolerance, the Court of Appeals' instructions are to enter a judgment of conviction. On the other hand, if the finding is that the accounts have not been shown to be in tolerance, then this court is instructed to grant the defendant's motion for judgment of acquittal.

The defendant, a United States postal worker, was accused of converting the proceeds of a $394.18 check which on July 7, 1981 had been given to her by St. Judge's for overdue postage. Under postal regulations, a receipt for overdue postage contained either a postage meter strip or cancelled stamps in the amount of the overdue postage. The government's theory was that the defendant failed to issue a receipt to St. Jude's for the $394.18 check, thus enabling her to convert $394.18 in cash or stamps. (Hannah at 184–85).

If the government's theory is correct and the defendant had done the conversion, her accounts would have been in tolerance, that is they would have balanced. Her withdrawal of $394.18 in either cash or stamps would have cancelled out the $394.18 represented by the St. Jude's check. If she had negligently or inadvertently failed to issue the receipt and did not convert funds or stamps in an amount equal to the check, the defendant's accounts would have shown an overage. For this reason the Court of Appeals held that in the absence

of direct proof that the defendant pocketed cash or stamps equal in value to the St. Jude's check, it was not enough for the government to prove that the defendant failed to give a receipt. It was critical for the government to prove that the defendant's accounts balanced (were in tolerance) within a reasonable time after the St. Jude's transaction. 716 F.2d at 461.

In this case, however, the defendant's defense was that she in fact issued a receipt to St. Jude's and that the receipt contained $394.18 in stamps, mostly $1.00 and $2.00 stamps, which she took from her stock of stamps. She gave this explanation to the postal inspectors shortly after the transaction (Hannah at 189); and she testified at trial to the issuance of such a receipt (*Brown* at 463–66). If the defendant had issued such a receipt, her accounts also would have been in tolerance. Her use of $394.18 worth of stamps to create the receipt would have had the same impact on her stock of stamps as a conversion of $394.18 in stamps. Her accounts would have balanced because the inflow of $394.18 resulting from the St. Jude's check would have been balanced by the outflow of $394.18 in stamps on the receipt. This fact explains the defendant's consistent argument, both at trial and on appeal and with different counsel, that her accounts were in tolerance after the St. Jude's transaction. The defendant perceived being in tolerance as evidence that the transaction occurred the way she testified it did.

The fact that the defendant's accounts were in tolerance, therefore, would support both the government's theory of conversion and the defendant's defense. Under these circumstances, the government sought to prove the defendant's criminal conduct by proving that her exculpatory statements were false. The government did prove that the defendant's statements to Inspector Hannah on July 16, 1981 regarding the alleged receipt, testified to by Hannah at 189, were in fact false exculpatory statements. Thus, the government proved more than the simple failure of the defendant to issue a receipt. Nevertheless, the instructions of the Court of Appeals require an analysis of the trial record to determine whether the defendant's accounts were proved to be in tolerance.

The defendant's accounts frequently were audited and the results of those audits are reflected on Exhibit 5. (Hannah at 260). There were two kinds of audits. (See generally Inspector Hannah's testimony at 160–61). The first was that Inspector Hannah described as "window accountability." (Hannah at 202–03; 260). A review of Exhibit 5 reveals that a window accountability audit was of two basic items: the "cash portion of fixed credit on hand" and "stock on hand." If the total of these amounts was greater than the employee's "fixed credit accountability," then an "overage" resulted. If the total was less than "fixed credit accountability," then a "shortage" resulted. A window accountability audit was basically "a perpetual inventory of the stock as counted approximately 120 days apart.[1] (Hannah at 206). Exhibit 5 reflected audits of the defendant's window accountability from July 14, 1974 to October 15, 1981. The entries for February, June, and October of 1981 are as follows:

---

1. While at this point in his testimony Inspector Hannah described Exhibit 5 as an inventory of stock, it is clear from the Exhibit that cash on hand was also audited. Cash would have to be audited in order to do the audit of window accountability. This was fully discussed by Inspector Hannah in his direct testimony. (Hannah at 160–61). Also, the references to "STA. AUDIT" on Exhibit 5 are to station audits, not stamp audits. This is clear from the asterisks on the first page (or top of) Exhibit 5. Only certain audits have the asterisks and those were audits conducted at the Pilsen Station where the defendant worked.

| Date | Fixed Credit Accountability | Cash Portion On Hand | Stock on Hand | Overage + Shortage − |
|---|---|---|---|---|
| 2/24/81 | 5263.53 | 424.74 | 4810.91 | − 27.88 |
| 6/18/81 | 6640.40 | 718.32 | 5958.54 | +36.46 |
| 10/15/81 | 9233.50 | 319.96 | 8918.15 | + 4.61 |

The other audit is of "reserve stock." Reserve stock was described by Inspector Hannah as the "unit reserve" and he defined "unit reserve" as the "bulk quantity of stamps that is maintained at the Station by a chief stamp clerk." (Hannah at 203). Thus, the audit of reserve stock was only a stamp audit and by definition did not include any cash audit. The defendant was a chief stamp clerk and Exhibit 5 contains the historic records of the audits of her reserve stock. The entries for February, June, and August of 1981 are as follows:

| Date | Fixed Credit Accountability | Stock on Hand | Overage + Shortage − |
|---|---|---|---|
| 2/24/81 | 55,766.89 | 55,766.89 | —— |
| 6/18/81 | 41,607.12 | 41,607.12 | —— |
| 8/25/81 | 42,505.20 | 42,212.20 | −293.00 |

There are no entries following the August 25th entry.

Inspector Hannah testified that on July 16, 1981, he made a physical count of the defendant's $1.00 and $2.00 stamps in her window accountability and in the unit reserve. (Hannah at 202). He made this audit to determine if the defendant could have created the receipt which she told the postal inspectors she gave to St. Jude's. The audit results were that the defendant could not have created the receipt she described because she did not have enough $1.00 and $2.00 stamps at her window or in the reserve unit.[2]

Most of Hannah's trial testimony was about this $1.00 and $2.00 stamp audit, because proof of the defendant's false exculpatory statement was a critical element of the government's proof. However, Hannah also testified: "In addition, Inspector Gorolski and I at a later date made a thorough audit of her window accountability and her unit reserve." (Hannah at 203). This would have been a complete audit of the defendant's accounts, including her cash on hand. This audit, and the results of this audit, are not reflected on Exhibit 5 and were not described further by Hannah during his testimony. However, in defendant's counsel's written closing argument, he describes in detail a July 28, 1981 audit:

> Her window accountability was $959.92 over and her chief stamp clerk (unit reserve) was $949.27 short. This comparison posted a shortage of $10.65. This was well within the acceptable range of tolerance for Ms. Brown's accounts.

The audit counsel described very likely was the "thorough audit" referred to by Hannah, but it was not introduced into evidence by either party. The existence of such an audit (even though not in evidence) explains why all the parties appeared during the trial to agree that the defendant was "in tolerance." It also is consistent with Hannah's testimony that the defendant historically was in tolerance (Hannah at 202–06), and the defendant's own testimony about the regularity of her accounts (*Brown* at 425–29).

However, the Court of Appeals rejected defense counsel's admission and instructed this court to search the trial record for proof that the accounts were in tolerance

---

**2.** The defendant later changed her story and said that she must have "borrowed" some stamps from her co-workers. (*Brown* at 468). The defendant's testimony was not believed.

after the St. Jude's transaction. The only audits in evidence are those reflected on Exhibit 5.[3] The first window accountability audit conducted after the St. Jude's transaction and reflected on Exhibit 5 was on October 15, 1981, 99 days after the transaction. The first reserve stock (or unit reserve) audit conducted after the St. Jude's transaction and reflected on Exhibit 5 was on August 25, 1981, 48 days after the transaction.

Regular audits were performed about every 120 days (Hannah at 206) and under post office regulations required to be performed every 120 days. (Hannah at 161). The October 15, 1981 window accountability audit was the next regularly scheduled audit since it occurred 118 days after the last audit reflected on Exhibit 5. The unit reserve audit on August 25, 1981 was not the regularly scheduled audit. It appears from a review of Exhibit 5 that window accountability and unit reserve audits were usually conducted on the same day, and there is no corresponding August 25th window accountability audit. It may have been a special audit performed simply because the defendant was under suspicion by the postal inspectors. However, it is the first audit after the transaction and it occurred well before the regular audit date.

■ Since both audits were within the regular audit period, the court finds that they were within a reasonable time after the St. Jude's transaction.

First, it was the government's theory that the defendant deliberately failed to issue a receipt for the $394.18 St. Jude's check to enable her to remove an equivalent amount of cash or stamps *at any time prior to the next audit.* "It wouldn't necessarily have to be taken that day. She could take it any time between then and her next audit." (Hannah at 185). The cash would have to be removed from the defendant's window account, or the unit reserve, prior to the next audit so that the defendant's accounts would balance and

not reveal possible malfeasance. Thus, the next regular audit would be the critical audit in the ordinary case.

Secondly, the purpose of the post office audit procedures is to insure "financial accountability for individual window clerks of the stock they receive and the transactions they are involved in on a daily basis." (Hannah at 203). The audits are conducted in part to detect employee malfeasance. If a regularly scheduled audit indicates a possible conversion of post office funds, the court obviously could rely on evidence of that audit, even if the actual conversion had occurred early in the period between regular audits. Spacing audits 120 days instead of more frequently clearly is a reasonable procedure for the post office to adopt. The post office's expertise in employee financial accountability, and its procedure of audits every 120 days, fully supports a finding that the audits in this case were conducted within a reasonable period after the St. Jude's transaction.

Also, in this case the use of audits 44 and 99 days after the transaction is reasonable because of the consistency of the defendant's accounts. As Exhibit 5 and Inspector Hannah's testimony show, the audits of defendant's accounts established a "trend" of consistently being in tolerance. (Hannah at 263). The defendant was able to maintain "fairly good control over her window accountability and the unit reserve." (Hannah at 266). Thus, the defendant was not erratic during the 120-day period between audits. If she mistakenly did not give St. Jude's the receipt, thereby creating an explainable overage in her accounts, that overage would have been reflected in the next regular audit. It would not have been obscured by any other mistakes in the intervening days because the defendant did not make $400 mistakes. She obviously, however, was fully capable of "adjusting" her accounts to cover an embezzlement.

Finally, it is irrelevant that the St. Jude's transaction on July 7th was almost immedi-

**3.** The Court of Appeals discussed Exhibit 5 and found it lacking. However, the Court apparently believed that Exhibit 5 did not reflect an audit of cash as well as stock and the Court did not discuss the October 15, 1981 window accountability audit. The Court did not preclude this court from relying on Exhibit 5.

ately suspected of involving employee malfeasance. What for sure occurred on July 7th was the defendant's deliberate failure to issue the receipt to St. Jude's. She was free to complete the conversion by actually taking the money or stamps at any time prior to her next audits. She also could have taken the money or stamps before the St. Jude's transaction but after the last regular audit on June 18, 1981. We do not know when she took the cash or stamps— only that it was accomplished at least by the next documented audits of her accounts on August 25th (unit reserve) and October 15th (window accountability).

The August 25th audit of unit reserve showed a shortage in stamps—not an overage. The October 15th window accountability audit showed a $4.61 overage, clearly within tolerance. An overage in the amount or the approximate amount of the St. Jude's check is not shown. Accordingly, the court finds that audits conducted within a reasonable time after the St. Jude's transaction do not show an overage. This is equivalent to finding that the audits showed that defendant's accounts were in tolerance.

Accordingly, pursuant to the instructions of the Court of Appeals, the court enters judgment of conviction on Count 4 of the indictment. It is so ordered.