UNITED STATES of America, Plaintiff–Appellee,

v.

Roy WOLF and Lorna Manlolo Wolf, a/k/a Lorna Manlolo McDevitt, Defendants–Appellants.

Nos. 87–1346, 87–1347.

United States Court of Appeals, Tenth Circuit.

Feb. 17, 1988.

Marvin J. Johnson, Edwards & Johnson, Cheyenne, Wyo., for defendants-appellants.

Richard A. Stacey, U.S. Atty., Cheyenne, Wyo., for plaintiff-appellee.

Before ANDERSON, McWILLIAMS and BALDOCK, JJ.

BALDOCK, Circuit Judge.

Roy and Lorna Wolf were indicted on one count of second degree murder, in violation of 18 U.S.C. § 1111,[1] and aiding and abetting second degree murder, in violation of 18 U.S.C. § 2.[2] A jury found both defendants guilty as charged. Roy Wolf was sentenced to confinement for eighty years, with a minimum of twenty-five years to be served, and specially assessed fifty dollars. Lorna Wolf was sentenced to confinement for eighty years, with a minimum of twenty years to be served and deportation to the Philippines mandatory upon her release, and specially assessed fifty dollars.

Appellant-defendant Roy Wolf was a Staff Sergeant in the United States Air Force stationed at F.E. Warren Air Force Base in Cheyenne, Wyoming. He is married to appellant-defendant Lorna Wolf, who joined him with their family at the base in August, 1985. Their family consisted of three children from Lorna's prior marriage, Lorena McDevitt, Lisa McDevitt, and Jackie McDevitt, and a fourth child resulting from her marriage to Roy.

In July of 1986, Jackie became ill. She complained of a stomachache, vomiting and diarrhea. Lorna took Jackie to two different doctors during the end of July and the beginning of August. Neither diagnosed a perforated bowel, but told Lorna that Jackie had acute gastroenteritis. One of the doctors made a follow-up telephone call to the Wolf residence during the second week of August to ask how Jackie was feeling, and Lorna told him that Jackie's health seemed to be "fine." During July and August of 1986, Esther Gerrish, a friend of Lorna's, repeatedly urged Lorna to seek medical attention for Jackie because of her continuing illness. Lorna told her that she was waiting for money from her ex-husband, Jackie's natural father, to take Jackie for medical treatment. All military personnel and their families have free access to emergency care available at the base seven days a week, twenty-four hours a day.

During the weekend of August 30, 1986, Gina Tobor, a family friend, had dinner at the Wolf home. She testified that she witnessed both Lorna and Roy hit Jackie in the face and pull her hair after dinner because Jackie was so ill that she was unable to eat or to ask to be excused from the table. Gina said that Roy then put Jackie in the backyard with the dog, and later immersed her in a bathtub of cold water. On September 1, 1986, Gina Tobor's husband, Sergeant Franklin Tobor, called emergency medical personnel to the Wolfs' house after Roy called him to tell him that Jackie was dead. When they arrived, they found Lorna clutching Jackie tightly. Jackie was dead and her abdomen was unusually distended.

An autopsy revealed that the cause of death was sepsis, a blood poisoning condition caused by peritonitis which resulted from a perforated bowel. Dr. Jill Gould, a forensic pathologist and a deputy coroner with the Denver County Coroner's Office, took microscopic sections of several organs in Jackie's body, especially those around the bowel and the perforation, and some

---

1. 18 U.S.C. § 1111(a) provides:

 Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

 Any other murder is murder in the second degree.

2. 18 U.S.C. § 2 provides:

 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States is punishable as a principal.

gross tissue samples. She also took external photographs of Jackie at the autopsy, but did not take photographs of the internal tissues. In addition, Dr. Gould discerned that Jackie had suffered a severe neck injury, occurring between four hours and two days prior to her death. She also found fifty-nine bruises and abrasions covering Jackie's body.

Defendants appeal on several grounds. First, they allege that they were denied due process because the government failed to produce gross tissue samples from Jackie's corpse after a court order was issued requiring production of all relevant medical evidence. Second, they maintain that the trial court erred in admitting statements against them under the coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E),[3] based on its summary finding that the statements were made "in furtherance" of a conspiracy between Roy and Lorna Wolf to commit child abuse, to conceal that abuse and to not seek adequate medical treatment for Jackie. In the alternative, Roy Wolf claims that the trial court erred in admitting those statements because they were hearsay which did not fit within the coconspirator exception. Finally, the Wolfs propose that their due process rights were violated by the government's misconduct in coercing witnesses to testify in its favor, resulting in a fundamentally unfair trial. We reject these contentions and affirm for the reasons set forth below.

## I.

Defendants allege that the government violated their constitutional rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1969), by failing to provide them with gross tissue samples of the deceased. In *Brady,* the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment...." *Id.* at 87, 83 S.Ct. at 1196–97; *accord United States v. Bagley,*

473 U.S. 667, 674, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). Where the defendant has made a specific request and the evidence is withheld, the verdict will be set aside if "the suppressed evidence might have affected the outcome of the trial." *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976). The Supreme Court has defined evidence as material where it creates "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. at 682, 105 S.Ct. at 3384; *accord United States v. Page,* 828 F.2d 1476, 1479 (10th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987). Where the evidence is material such that the omission deprived the defendant of a fair trial, the verdict must be set aside due to the constitutional violation. *United States v. Agurs,* 427 U.S. at 108, 96 S.Ct. at 2399–400. If the means of obtaining the exculpatory evidence has been provided to the defense, however, a *Brady* claim fails, even if the prosecution does not physically deliver the evidence requested. *United States v. Dupuy,* 760 F.2d 1492, 1501 n. 5 (9th Cir.1985).

Consequently, to establish a *Brady* violation, the defense must prove that: (1) the prosecution suppressed the evidence; (2) the evidence would have been favorable to the accused; and (3) the suppressed evidence is material. *See United States v. Latimer,* 780 F.2d 868, 871 (10th Cir.1985). In determining whether a *Brady* violation occurred, this court must not view the suppressed evidence in isolation, but instead must review it in light of the entire record. *Trujillo v. Sullivan,* 815 F.2d 597, 613 (10th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987) ("Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest.").

---

3. Fed.R.Evid. § 801(d)(2)(E) provides:
 **Admission of a party-opponent:** The statement is offered against a party and is ... a

statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

The court must examine both inculpatory evidence and exculpatory evidence. *Id.*

■ In the instant case, the prosecution did not conceal evidence of the gross tissue samples. The district court ordered that "the defendants' motion for order compelling medical discovery be, and the same is, hereby granted to the extent that only the medical evidence, slides, tests, etc., in the government's possession or at the Denver Coroner's office, or at the Fitzsimmons' base facilities in Colorado shall be produced; ..." Rec. vol. I, doc. 21 at 3. In compliance with the discovery order, the prosecution gave defense counsel the autopsy report made by the coroner, Dr. Jill Gould. The autopsy report listed gross tissue samples as evidence collected during the examination. Autopsy Report, Ct. Ex. 20 at 11–12. Thus, the defense clearly had notice of the existence of that evidence. At oral argument before this court, the government represented that it had instructed defense counsel to contact the coroner directly for any physical evidence that might be needed at trial. The government further represented that it also called, with the approval of defense counsel, defendant's medical expert, Dr. Eckert, and asked the doctor to call the coroner for any information or evidence necessary for his trial testimony. Because the prosecution did not suppress the evidence, there was no *Brady* violation.

## II.

■ Defendants allege that the district court erred by failing to provide the rationale underlying its determination that certain statements were admissible against the defendants under the coconspirator exception. These statements were made by non-conspirator declarants concerning what members of the conspiracy, Roy and Lorna, had revealed regarding the conspiracy. Once the government presents evidence of the conspiracy, the trial court must make a factual determination that the government has established, by a preponderance of the evidence, the following elements: (1) a conspiracy existed; (2) the defendant against whom the declaration is offered was a member of the conspiracy; and (3) the statement was made in the course of and in furtherance of the conspiracy. *United States v. Hernandez,* 829 F.2d 988, 993 (10th Cir.1987) (citing *United States v. Petersen,* 611 F.2d 1313, 1330–31 (10th Cir. 1979)). In making this determination, the court may consider the hearsay statements as well as the independent evidence presented. *Bourjaily v. United States,* — U.S. ——, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987).

■ The district court in a separate hearing prior to trial held the evidence admissible on the ground that:

> there is 'substantial, independent' evidence that a 'conspiracy,' or 'combination' between the defendant Roy Wolf and Lorna Wolf existed; that they were members of the conspiracy; that the statements were made in the course of and in furtherance of the conspiracy involving possible abuse or the possible attempt to cover up abuse and failure to seek adequate medical attention.

Rec. vol. I, doc. 43 at 4. In making its determination, the district court reviewed the independent evidence of the conspiracy presented by the government: photographs of the deceased child which depict injuries, such as a grossly distended stomach and numerous bruises; statements of other witnesses regarding alleged prior acts of child abuse or neglect; and testimony of the defendants' friends who had seen Jackie prior to her death and had become concerned for her health after observing Jackie's bloated stomach and general poor appearance. *Id.* at 3–4. He found that the conspiracy involved "possible abuse or the possible attempt to cover up abuse and failure to seek adequate medical attention." *Id.* at 4. Consequently, the trial court made the requisite findings of fact regarding the conspiracy based upon the appropriate evidence. The court is not required to make additional findings to explain the rationale. *See United States v. Davis,* 766 F.2d 1452, 1458 (10th Cir.), *cert. denied,* 474 U.S. 908, 106 S.Ct. 239, 88 L.Ed.2d 240 (1985).

Defendant Roy Wolf argues in the alternative that the trial court erred in admitting certain statements against him under the coconspirator exception because those statements were not made "in furtherance" of the conspiracy, but rather were "mere narratives" and therefore inadmissible as beyond the scope of the coconspirator exception. Mere narratives are "statements relating to past events, even those connected with the operation of the conspiracy where the statement serves no immediate or future conspiratorial purpose." 4 D. Louisell & C. Mueller, Federal Evidence § 427 (1980); *see, e.g., United States v. Gomez,* 810 F.2d 947, 953 n. 6 (10th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 2488, 96 L.Ed.2d 379 (1987) (citing *United States v. Traylor,* 656 F.2d 1326, 1332 (9th Cir. 1981) (quoting *United States v. Moore,* 522 F.2d 1068, 1077 (9th Cir.1975)) (stating that "mere narratives" are statements by a coconspirator which "were either mere conversations or 'casual admissions of culpability to someone [they] had decided to trust'"); *United States v. Posner,* 764 F.2d 1535, 1538 (11th Cir.1985), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986) (recognizing that evidence which "spilled the beans" regarding the conspiracy could not be considered to have advanced any objective of the conspiracy); *United States v. Foster,* 711 F.2d 871, 880 (9th Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984) (defining mere narratives as those statements which do not seek to induce the listener to deal with or further the conspiracy).

Conversely, statements are admissible under the coconspirator exception if they are intended "'to promote the conspiratorial objectives.'" *United States v. Reyes,* 798 F.2d 380, 384 (10th Cir.1986) (quoting *United States v. Hamilton,* 689 F.2d 1262, 1270 (6th Cir.1982)). The statements need not actually have furthered the conspiracy to be admissible. *United States v. Reyes,* 798 F.2d at 384 (recognizing that this circuit has "no talismanic formula for ascertaining which conspirator's statements are

'in furtherance' of the conspiracy"). Statements made by a coconspirator to allay suspicions are admissible. *United States v. Miller,* 664 F.2d 94, 98 (5th Cir.1981), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982) (citing *United States v. James,* 510 F.2d 546, 549–50 (5th Cir.1975)). Similarly, concealment of the crime done in furtherance of the main criminal objectives of the conspiracy falls within the coconspirator exception. *United States v. Howard,* 770 F.2d 57, 61 (6th Cir.1985); *United States v. Pennett,* 496 F.2d 293, 296 (10th Cir.1974). In *Grunewald v. United States* the Supreme Court noted that concealment furthers the main criminal objectives where "the successful accomplishment of the crime necessitates concealment." *Grunewald v. United States,* 353 U.S. 391, 405, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957). Conversely, concealment after the main conspiracy has ended falls beyond the purview of the coconspirator exception. *United States v. Silverstein,* 737 F.2d 864, 867 (10th Cir.1984).

Under the coconspirator rule, the determination of whether to admit hearsay evidence is within the discretion of the trial judge. *See United States v. Hernandez,* 829 F.2d at 994–95; *United States v. Reyes,* 798 F.2d at 383. This court, therefore, will not reverse the conviction unless the district court abused its discretion. *Id.* (citing *United States v. Cooper,* 733 F.2d 1360 (10th Cir.1984)).

Defendant Roy Wolf contends that five statements were erroneously admitted against him.[4] We consider each of those statements. First, Esther Gerrish testified that she noticed that Jackie had a patch over her eye, and asked Lorna the reason for the patch:

Q. Now, did you have occasion at that time to ask either Lorna or Roy about the injury to Jackie's eye?

A. I asked Lorna. It was preseason, it was a softball game or practice for a softball game, preseason, and I asked Lorna what happened to Jackie.

. . . . .

**4.** All five statements are admissible against Lorna Wolf as admissions against party-opponent pursuant to Fed.R.Evid. 801(d)(2)(A).

Q. Would you tell the jury what Lorna told you about the matter?

A. She told me she fell, and then when we started discussing the stitches, how many stitches she had, and other things, she told me what happened, how—I asked her, how did Jackie fall, and that's when she told me—

Q. Would you tell the jury what Lorna told you?

A. She told me that she was downstairs, and Roy came downstairs and told her to go upstairs, because Jackie was bleeding.

When she went upstairs, Jackie had a washcloth over her eye, and Lorna told me that Jackie had her—her eye was bleeding, and that what happened, what she told me what happened, was that Roy said that Jackie was on his lap, sitting on his lap, and she was fidgeting, he wanted her to stay still, and she couldn't, so, she urinated on him, so he shoved her off of his lap, and she hit her eye on a piece of furniture, ...

Rec. vol. IV at 75–76. However, Gina Tobor testified that when she saw the same patch on Jackie's eye and asked Lorna how she had hurt her eye, Lorna gave an inconsistent response:

Q. Do you remember seeing a cut over Jackie's eye at one time?

A. Yes, when I met Lorna, I see some cut on her head, Jackie Lyn, in the right side.

Q. Was it over her eye?

A. Yeah, in the right side, on the eye, and Lorna told me about that, she said—

Q. What did she say?

A. She said that Roy hit Jackie Lyn, and he pushed her in the bed, that's why Jackie Lyn, she have a cut in the head, and then they bring Jackie off base, they don't—they—they wouldn't ask questions about Jackie Lyn, why she have cut on the head ... Lorna said she don't want her husband to get her in trouble, so, they decided to take Jackie Lyn off base, in a hospital.

Rec. vol. IV at 117. The contradictory explanations for the same injury to Jackie reveal that Lorna was attempting to divert suspicion from herself and to conceal the abuse in order to continue the conspiracy. The efficacy of the statements is irrelevant. Moreover, they indicate Lorna's failure to get adequate medical care for Jackie in accord with the conspiracy. Consequently, both statements are admissible against Roy under the coconspirator exception because statements made by one conconspirator in furtherance of the conspiracy are attributed to each member of the conspiracy. *United States v. Morris*, 623 F.2d 145, 148 (10th Cir.1980).

 Roy also contested the admissibility of a statement by Lorna to Esther Gerrish regarding the reason that the Wolfs failed to take Jackie to the hospital for her stomach distension. Several times throughout the summer, Esther Gerrish repeatedly exhorted Lorna to take Jackie to the doctor. As the summer wore on, Esther developed an antagonistic relationship with Lorna due to her concern about Jackie's rapidly deteriorating health and her suspicion of child abuse. At trial, Esther Gerrish testified regarding Lorna's malevolent neglect for Jackie's poor health:

Q. Do you recall seeing Jackie again at another softball game?

A. Uh-huh.

Q. How much later?

A. Sometime in August.

. . . . .

Q. As a result of your conversation with Jackie, did you confront Lorna?

A. Yes.

Q. When?

A. Right when I was still holding Jackie, later on, towards the end of the game.

Q. What did you say to Lorna?

A. I asked her, I think I know why you won't take Jackie to the hospital, and she didn't say anything, and I said, you won't take her because Roy hit her again, and she said yes, and I told her, you have to start thinking about Jackie, because she's going to get sicker and sicker, and what's going to happen, what is more important, taking Jackie to the hospital, or worrying about what's going to happen to Roy.

And she just stood there, she didn't stay (sic) nothing, and then I was still holding Jackie, talking to her, and Roy walked up and took Jackie away from me, and they left, and she didn't say anything, she didn't even reply, she just walked away.

Rec. vol. IV at 81–82. Lorna's nonverbal response to Esther Gerrish's accusations is admissible against Lorna as an adoptive admission.[5] Her adoptive admission was a means by which she concealed the conspiracy in light of the context of the declarant's statement. The declarant was accusing one of the conspirators, Lorna, of covering-up child abuse. When confronted, Lorna did not reveal the conspiracy, but instead continued to cover-up by walking away. Consequently, it is a statement in furtherance of the conspiracy and therefore is admissible against Roy Wolf under the coconspirator exception.

■ One week later, Esther Gerrish saw the Wolfs at a softball game and noticed that Jackie was still ill. She again questioned Lorna about her failure to take Jackie to a doctor:

Q. As a result of your conversation with Jackie at that time, did you, again confront Lorna?

A. Yes, but—

Q. What did you say to Lorna?

A. I asked her, I asked her, Lorna, how come you haven't taken Jackie to the hospital, and she said that she was waiting for the girl's dad to send them some money so they could take her off base.

Rec. vol. IV at 83. This statement is admissible against Roy under the coconspirator exception because it is a statement which allayed Esther Gerrish's suspicions. *See United States v. Miller,* 664 F.2d at 98. Moreover, by satisfying Esther Gerrish's concerns regarding Jackie's health, Lorna covered up the conspiracy and indicated her unwillingness to seek necessary medical treatment for Jackie, thereby permitting continuance of the conspiracy.

■ Another statement claimed inadmissible by Roy concerned a visit to the house by Gina Tobor. When Gina visited the Wolfs and saw Jackie lying on the floor, she testified that she asked Lorna why Jackie was lying there:

Q. Now, Gina, I would like to have you remember forward a little bit, do you remember about the middle of July of 1986, and being over at Lorna and Roy's house?

A. Yes.

Q. Do you remember seeing little Jackie there at that time?

A. I seen Jackie Lyn in the middle of July, when I visit Lorna in morning, I see Jackie Lyn laying on the floor, and then I asked my friend Lorna why she is laying down there, and she says, she was sick.

Q. Did she say why she was sick?

A. She said Roy hit Jackie Lyn in the stomach. That's why she was laying down there, for whole days.

Rec. vol. IV at 118. This statement was inadmissible against Roy under the coconspirator exception because it is a mere narrative and does not further the conspiratorial objectives of abusing the child or covering-up the abuse. *See United States v. Posner,* 764 F.2d at 1538.

■ Although this statement was erroneously admitted against Roy, its admission did not constitute reversible error. *See* Fed.R.Evid. 103(a)(1). Where evidence of the defendant's guilt is proved by overwhelming evidence, an erroneous ruling may be harmless beyond a reasonable doubt. *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969); *see, e.g., United States v. Morales–Quinones,* 812 F.2d 604, 610 (10th Cir.1987); *United States v. Bibbero,* 749 F.2d 581, 584 (9th Cir.1984), *cert. denied,* 471 U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985). Moreover, there is no reversible error where the declarant testifies in court and is subject to cross-examination,

---

5. This is admissible against Lorna as an adoptive admission pursuant to Fed.R.Evid. 801(d)(2)(B). Where a person hears, understands and has the opportunity to deny an accusatory statement made in his presence, the statement and his failure to deny it are admissible against him as an adoptive admission. *United States v. Coppola,* 526 F.2d 764, 769–70 (10th Cir.1975).

regardless of whether opposing counsel actually questions the declarant. *See United States v. Whalon,* 526 F.2d 1117, 1119 (10th Cir.1975).[6] After a thorough review of the entire record, this court finds that because there is overwhelming evidence of Roy Wolf's guilt, any hearsay statements erroneously admitted against Roy constituted harmless error.

### III.

 Finally, the Wolfs allege that the government misconduct in threatening witnesses to coerce their testimony in favor of the government violated the Wolfs' due process rights, resulting in fundamental error. They propose that the Air Force Office of Special Investigations threatened two witnesses, Franklin and Gina Tobor, with Gina Tobor's deportation if they refused to provide favorable testimony for the government.

Admission of testimony is within the trial court's discretion. *United States v. Rothbart,* 723 F.2d 752, 755 (10th Cir.1983). This court will not deem the admission in error unless the trial court abused its discretion in admitting the testimony of those two witnesses. *See id.* We find that the trial court properly admitted the testimony because the evidence was relevant under Fed.R.Evid. § 403, and defense counsel had the opportunity, which he exercised, to fully cross-examine the witnesses on the issue of alleged coercion. *See United States v. Neal,* 718 F.2d 1505 (10th Cir.1983), *cert. denied,* 469 U.S. 818, 105 S.Ct. 87, 83 L.Ed.

2d 34 (1984). Thus, the jury was informed of the circumstances under which the written statements and testimony were given and was free to give the information whatever weight it desired, as well as to determine the credibility of the witnesses. *See United States v. Shelton,* 736 F.2d 1397, 1402 (10th Cir.), *cert. denied,* 469 U.S. 857, 105 S.Ct. 185, 83 L.Ed.2d 119 (1984). Moreover, the two witnesses testified that they were not coerced by the Office of Special Investigation. *See* rec. vol. V at 38. Because the trial court did not erroneously admit the testimony of these witnesses, it did not commit fundamental error in violation of the Wolfs' due process rights.[7]

AFFIRMED.

---

**6.** Although not addressed by the defendants on appeal, the government asserts in its brief that the confrontation clause was not violated and that there was no confrontation clause problem like that presented in *United States v. Bruton,* 391 U.S. 123, 124, 88 S.Ct. 1620, 1621, 20 L.Ed. 2d 476 (1968). We agree. In *Bruton,* a co-defendant, Evans, told a postal inspector that he and petitioner had committed a robbery. *Id.* at 124, 88 S.Ct. at 1621. The postal inspector testified that the co-defendants had committed the robbery. *Id.* Evans did not take the stand. *Id.* at 136, 88 S.Ct. at 1628. Although limiting instructions were given to disregard the confession as against petitioner, petitioner argued nonetheless that his sixth amendment rights under the confrontation clause were violated. *Id.* The Supreme Court held that because of the substantial risk that the jury, despite instruc-

tions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in the joint trial violated petitioner's right of cross-examination secured by the confrontation clause. *Id.* at 136–37, 88 S.Ct. at 1628.

Neither *Bruton* nor the confrontation clause was violated in this case because the declarant, Roy Wolf and Lorna Wolf all testified and were subject to cross-examination. *See Nelson v. O'Neil,* 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971); *United States v. Shepherd,* 739 F.2d 510 (10th Cir.1984).

**7.** The government raised the issue of whether defendants have standing to raise the due process claim. Because we find no error by the trial court resulting in a due process violation, we decline to decide this issue.