**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Stanley Douglas POWELL,
Defendant–Appellant.**

**No. 91–1114.**

United States Court of Appeals,
Tenth Circuit.

Aug. 28, 1992.

Rehearing Denied Oct. 5, 1992.

Joseph Mackey, Asst. U.S. Atty. (Michael J. Norton, U.S. Atty., with him on the brief), for plaintiff-appellee.

Hilary Holland, Westminster, Colo., for defendant-appellant.

Before: MOORE, ENGEL * and KELLY, Circuit Judges.

ENGEL, Senior Circuit Judge.

Defendant Stanley Douglas Powell appeals from his conviction on fourteen counts of using counterfeit access devices in violation of 18 U.S.C. § 1029(a)(2), (a)(3). Powell particularly focuses his challenge on the district court's failure to make sua sponte findings of fact. Powell also raises questions about the method of proving violations of section 1029 and the court's seeming decision to admit hearsay statements against him. We affirm on all counts.

---

* Honorable Albert J. Engel, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, sitting by designation.

## I.

On September 12, 1990, the government issued its initial indictment of Powell on two charges of unauthorized possession of fifteen or more access devices [1] in violation of 18 U.S.C. § 1029(a)(3). The government soon expanded the charges to include fourteen charges of obtaining $1,000 or more of goods through the unauthorized use of access devices.[2] 18 U.S.C. § 1029(a)(2). Powell waived his right to a jury, and the court held a bench trial in January of 1991.

At trial, the government sought to prove that Powell was "the Ticketman." Briefly put, the government believed Powell fraudulently used other people's credit cards to buy airline tickets which he would sell to third parties at a "reduced" cash price. Under the government's hypothesis, people would approach either Powell or his associates with a travel itinerary. In turn, Powell would call one of the airlines and make the necessary arrangements, charging the tickets to a credit card. Invariably, Powell would use a credit card number without the owner's permission or knowledge, having obtained that number from another source. Powell had a number of addresses he used to receive the tickets. Once he picked up the ticket, he would deliver it to the grateful passenger, who would ask no questions and pay him in cash.

At trial, the government introduced evidence seized pursuant to a search warrant from the apartment of Powell's codefendant, Venus Walker. Powell had been living with Walker before his arrest. The search revealed handwritten slips with airline phone reservation and ticket verification numbers, travel itineraries or names of people the government claimed Powell sold tickets to and the names of people whose addresses Powell used to receive tickets. The government also retrieved handwritten credit card information: names, card numbers and expiration dates.

This handwritten credit card information offered some hint as to how Powell operated, and a former employee of Dollar Rent-A-Car, Michael Stump, offered testimony that filled in a bit more of the picture. Stump explained that he had written down the credit card information of people who rented cars at Stapleton International Airport in Denver, and then sold the information to Powell for ten dollars per account number. Stump's sales accounted for some, but not all, of the credit cards used by Powell. The government could not identify a source for the other account information.

As noted above, the government alleged that with the unauthorized credit information in hand, Powell would contact various airlines and order tickets by telephone. Airline representatives related the normal telephone ticketing procedure: operators would take the travel and credit card information given to them by the customer, and then send the tickets to the address specified. The representatives would not verify the identity or address of the customer, accepting as true the information given to them. The government offered proof that Powell used twelve different addresses for the receipt of tickets. The government had surveillance photographs of Powell picking up airline tickets at one address, Powell lived at three of the other addresses at various other times, people stated that they had seen Powell receive airline mail under various names at a total of eight of the addresses, and Powell had some connection to the remaining four addresses.

On June 8, 1989, the Denver police taped a telephone conversation in which Powell agreed to purchase airline tickets for Glen Glasper. Powell eventually bought those tickets using a credit card number other than Glasper's. The government offered testimony from other of Powell's alleged customers as well. They all said they had

---

1. 18 U.S.C. § 1029(e)(1) defines an "access device" as "any card, plate, code, account number, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds...."

2. An "unauthorized access device" is an access device which is "lost, stolen, expired, revoked, canceled, or obtained with intent to defraud." 18 U.S.C. § 1029(e)(3).

given Powell cash for cut-rate airline tickets.

Also testifying were Anthony Vernando and William Smith, two people who claimed to have been working with Powell. These two men had owned a fish market where they illegally purchased food stamps for cash. They would also arrange sales of airline tickets for food stamps. They testified that Powell had provided them with the tickets. An undercover detective on the Denver police force who conducted an investigation of the men for the food stamp fraud provided testimony that he had bought a number of airline tickets for food stamps from the two. Furthermore, on one occasion in 1988, Powell identified himself to the detective as "the man who gets the tickets" while flashing a Continental Airlines envelope. After Powell left the room to confer with the food market owners, one of the owners returned with Continental Airlines tickets to sell to the detective.

At the conclusion of the government's case, Powell made a motion for judgment of acquittal. FED.R.CRIM.P. 29(a). The court indicated it wanted some time to consider the motion, and the defendant stipulated to a reservation on the motion. The district court, however, neglected to enter a decision on the motion at any time.

At the end of the trial, the government dropped one of the 18 U.S.C. § 1029(a)(3) charges because the district attorney did not believe he had shown simultaneous possession of fifteen or more cards on the date in question. The court convicted Powell on the remaining section 1029(a)(3) charge, and on thirteen of the fourteen section 1029(a)(2) charges. The court issued only general findings to support these convictions. Finally, the court sentenced Powell to sixty months in prison. Powell now challenges both his convictions and the sentences he received.

## II.

Powell's first group of challenges relates to the evidence before the court and the court's treatment of that evidence. Initially, he complains that the trial court committed reversible error when it failed to make specific findings of fact. Federal Rule of Criminal Procedure 23(c) governs criminal bench trials, and it provides:

> In a case tried without a jury the court shall make a general finding and shall in addition, on request made before the general finding, find the facts specially. Such findings may be oral. If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact appear therein.

FED.R.CRIM.P. 23(c). Powell never made any request for special factual findings. Nonetheless, he argues that the judge's request to the prosecution for a cross-reference between the documentary evidence and the individual counts and complicated nature of the proofs in this case required the judge to make these findings sua sponte. He further claims that the lack of findings of fact preclude a meaningful review of the trial.

■ Powell's suggestions run counter to the import of Rule 23(c). The Rule predicates the requirement of specific fact findings not on the court's subjective judgment about the complexity of a particular case, or a judge's request for a referencing system, but rather the Rule conditions the specific findings on the party's articulated desire to have them. As for the appellate court's ability to review the trial, certainly, specific findings of fact by the district court will always be helpful. Their existence is not a necessity, however, because the appellate court will imply findings supporting the judgment if the evidence, viewed in a light most favorable to the government, warrants them. *United States v. Musser,* 873 F.2d 1513, 1519 (D.C.Cir.), *cert. denied,* 493 U.S. 983, 110 S.Ct. 518, 107 L.Ed.2d 519 (1989); *United States v. Ochoa,* 526 F.2d 1278, 1282 n. 6 (5th Cir.1976).[3] Since the appellate court

**3.** Powell contends that the Seventh Circuit found that Rule 23(c) required findings in complex cases in *United States v. Brown,* 716 F.2d 457 (7th Cir.1983). Although it would not be binding on this court in any event, all *Brown* did was to remand the case for specific findings

may imply essential findings, the district court does not have to provide them, even in complicated cases. Therefore, we refuse to graft any additional requirements onto Rule 23(c), and hold that specific findings must be made only following a timely request for them.

Powell next claims that the evidence, even with all of the inferences drawn, does not support his conviction on any of the charges. He first attacks his section 1029(a)(3) conviction, arguing that the government failed to prove simultaneous possession of fifteen or more access devices on the specified date of June 8, 1989. *See United States v. Russell*, 908 F.2d 405 (8th Cir.1990). Powell argues that he could be convicted only if he used fifteen or more cards on that date.

■ As with his argument seeking specific findings, Powell ignores the plain language of the statute in question. Section 1029(a)(3) specifically provides:

> Whoever—(3) knowingly and with intent to defraud possesses fifteen or more devices which are counterfeit or unauthorized access devices ... shall ... be punished as provided....

Clearly, section 1029(a)(3) refers only to possession, not to use. If Congress had meant to punish only use, it could very easily have said so, as it did in other parts of section 1029. Instead, it punishes possession with the requisite intent. Thus, like the Eighth Circuit, we refuse to read the statute to produce the ridiculous result that "a defendant must use at least fifteen cards at the same moment in time in order to violate the statute." *United States v. Farkas*, 935 F.2d 962, 967 (8th Cir.1991). The government need only show possession with the requisite intent of fifteen or more devices on a set date.

The government met its burden to establish Powell's possession of the card numbers. On July 12, 1989, a search of Powell's current residence, the home of Venus Walker, unearthed information on at least twenty cards in the handwriting of the rental car agent, Michael Stump. Powell had used all of the numbers in question to purchase tickets on or before June 8, 1989. The fact that Powell still had the numbers at his residence demonstrates that Powell maintained possession of more than fifteen access devices on the crucial date. His fraudulent intent is unquestioned.

■ As for his thirteen convictions for violation of 18 U.S.C. § 1029(a)(2), Powell argues that insufficient evidence existed for those charges, too. Powell claims that section 1029(a)(2) requires proof of actual loss and, while the prosecution presented evidence that the Delta tickets were used, it failed to do so for the Continental and America West ones. Without evidence that any of those two airlines' tickets were used, Powell reasons that the government's case against him must fail.

Powell's argument, however, suffers from a fatal flaw: it too ignores the language of the statute. The statute requires punishment of anyone who:

> knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period.

18 U.S.C. § 1029(a)(2). "Obtain[ing] something] of value aggregating $1,000 or more" does not mean that the victim must suffer an actual loss of $1,000, only that the perpetrator realize at least a $1,000 gain. *See United States v. Scartz*, 838 F.2d 876 (6th Cir.), *cert. denied*, 488 U.S. 923, 109 S.Ct. 303, 102 L.Ed.2d 322 (1988). The prosecution did show that Powell obtained airline tickets with a value exceeding $1,000 on each of the cards.

■ Powell's final argument related to the sufficiency of the evidence is also meritless. He argues that no evidence exists to show violations of section 1029(a)(2) in 1988. He bases this claim on the testimony of Michael Stump, the Dollar Rent–A–Car employee who stated that he sold Powell credit card information beginning in 1989. Since Stump only sold him the information

because the court of appeals could not find the evidence in the record which would sup-

ported a necessary fact. Thus, *Brown* is eminently consistent with the existing rule.

in 1989, Powell concludes that the government failed to prove its case as to 1988. The government agrees with Powell's summary of Stump's role in 1989, but as the government correctly notes, Stump's testimony related to the section 1029(a)(3) charge. Stump's testimony is irrelevant to the section 1029(a)(2) charges. Instead the government proved its case on those charges through the testimony of other witnesses, the airline testimony, the handwritten travel itineraries, controlled deliveries of particular tickets and the like. Thus, sufficient evidence existed for the court to convict Powell on all of the charges against him.

■ Our finding that sufficient evidence existed to convict Powell significantly impacts on his next claim of error as well. Powell claims that the district court committed reversible error when it failed to rule on his motion of acquittal. Federal Rule of Criminal Procedure 29(a) states in relevant part:

> The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offense charged ... after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

The court failed to follow the Rule's mandate in two respects: it first deferred ruling on the motion, and then it failed to rule on the motion at all. Nonetheless, we find these errors to be harmless. *See, e.g., United States v. Chorman,* 910 F.2d 102, 110 n. 12 (4th Cir.1990); *United States v. Reifsteck,* 841 F.2d 701, 703 (6th Cir.1988). Failure to rule on a Rule 29(a) motion constitutes harmless error "if at the close of the government's case in chief the evidence viewed in the light most favorable to the government was sufficient to permit submission of the case to the jury." *Reifsteck,* 841 F.2d at 703. All of the evidence supporting Powell's conviction, as detailed above, was given in the government's case in chief. Therefore, we find that sufficient

evidence existed to establish a prima facie case against Powell and consequently the court's error was harmless.[4]

■ Powell's final complaint about the evidence against him relates to the admission of hearsay statements. Federal Rule of Evidence 802 prohibits the use of hearsay unless it corresponds to one of the Rules' stated exceptions to the hearsay rule. Statements by coconspirators during the course of and in furtherance of a conspiracy do not fit, however, within the definition of hearsay. FED.R.EVID. 801(d)(2)(E). Instead, the court views these statements as admissions by a party. *Id.* The Supreme Court has elaborated on the trial court's duty under Rule 801, "[b]efore admitting a co-conspirator's statement over an objection that it does not qualify under Rule 801(d)(2)(E), a court must be satisfied that the statement actually falls within the definition of the Rule." *Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987).

■ The trial court must state its satisfaction that the standards of Rule 801 have been met on the record. *United States v. Radeker,* 664 F.2d 242 (10th Cir. 1981). Specifically, the disputed statement will not be admissible unless the trial judge finds that the conspiracy existed, that the declarant and the particular defendant were members of the conspiracy, and that the statement was made during the course of and in furtherance of the conspiracy. *United States v. Andrews,* 585 F.2d 961 (10th Cir.1978); *Radeker,* 664 F.2d at 243. Failure to make these findings in a jury trial constitutes reversible error, regardless of whether the defendant requested them. *United States v. Perez,* 959 F.2d 164 (10th Cir.1992).

■ A different rule applies, however, in bench trials. While the rule on admissibility remains unchanged, we require explicit findings only when the defendant makes a specific request for them. *United States v. Alfonso,* 738 F.2d 369, 371 (10th Cir.1984). The record indicates that the

---

**4.** In addition, Powell's agreement to the court's taking the motion under advisement robs his argument of impact.

defendant failed to make such a request here. Therefore, we will uphold the district court's admission of these statements if sufficient independent evidence of the *Andrews* elements existed. *Id.*

Powell asserts error in the admission of statements by two witnesses. First, one woman who bought tickets claimed that Walker, Powell's codefendant and girlfriend, told her she could get cheap airline tickets from Powell. Powell's only claim of error related to this statement is that the trial court failed to make findings admitting it. Crucially, he fails to argue that insufficient evidence exists to connect him with Walker, or the statement by Walker to the goals of the conspiracy. Since the court's failure to make findings is not reversible error, Powell's argument on this statement cannot succeed.

The Denver police detective made the second troublesome statement. Although Powell does not specify that portion of the detective's testimony to which he objects, we assume his protests focus on statements by Smith and Vernando, the fish market owners and food stamp defrauders. The detective said that Smith or Vernando told him they had to talk to their man on the tickets. Powell makes no claim of error related to the admission of Vernando's testimony. He does offer, however, a bald assertion that Smith was not a coconspirator.

Regardless whether the court erred in admitting this one statement by Smith, its admission could not constitute reversible error. *See* Fed.R.Evid. 103(a)(1); *United States v. Wolf,* 839 F.2d 1387, 1395 (10th Cir.), *cert. denied,* 488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988). In *Wolf,* we held the admission of statements which did not fit within the coconspirator exception to be harmless error on the grounds of other overwhelming evidence of the defendant's

guilt. *Id.* Similarly, as detailed above, the evidence of Powell's guilt could certainly be described as overwhelming, and the admission of a Smith's labelling of Powell as the ticketman added nothing to that evidence. Additionally, as stated in *Wolf,* "there is no reversible error where the declarant testifies in court and is subject to cross-examination...." *Id.* at 1395–96. Smith not only testified at Powell's trial; he repeated the questioned statement.

### III.

Powell's final two claims of error relate to his sentencing.[5] He claims the district court erred when it made two upward adjustments to the base offense level. The court made the first two level adjustment on the grounds that Powell acted as a leader. The court based the second two level adjustment on Powell's obstruction of justice through his attempts to influence witnesses. We review both of these allegations of error under the clearly erroneous standard. *United States v. Reid,* 911 F.2d 1456 (10th Cir.1990) *cert. denied,* — U.S. ——, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991); *United States v. Williams,* 897 F.2d 1034 (10th Cir.1990) *cert. denied,* — U.S. ——, 111 S.Ct. 2064, 114 L.Ed.2d 469 (1991).

We find Powell's claim that he did not act as a leader to be meritless. Contrary to his assertion, the evidence against Powell showed that his involvement went beyond that of a mere co-participant. Control or organization identify a defendant as a leader under 3B1.1. *United States v. Reid,* 911 F.2d 1456, 1465 (10th Cir.1991). Powell recruited Stump and unidentified others to obtain credit card information. He used other people, such as Smith, Vernando and Walker, as sales representatives; they would obtain ticket orders and Powell would fill the orders. Powell was

---

5. Powell also argues that his conviction should have been reversed because of the court's denial of his request to dismiss his second court appointed lawyer a few weeks prior to trial. We find this assertion of error to be groundless. The trial court properly inquired into the basis for the request before denying it. Furthermore, the assertion that counsel had divided loyalty

lacks any foundation in fact, as do a number of Powell's other claims on appeal. Finally, after the end of a discussion with Powell about his desire for a new attorney and a detailed explanation of the Speedy Trial Act, Powell indicated on the record that he was amenable to retaining the same attorney.

the hub on this particular wheel, and the district court did not err in awarding him a two point enhancement for his role.

Finally, Powell claims error in the two level increase for obstruction of justice. The court awarded the increase for Powell's attempts to "influence" the testimony of the trial witnesses. At the sentencing hearing, two postal inspectors testified. The first, Lemke, related that he had been contacted by Glen Glasper, the man whose negotiations with Powell had been taped. Glasper told Lemke that Powell had called him and threatened him, saying "I appreciate what you did for me and I am going to try to return the favor one day." Glasper also said that Powell had called Glasper's sister a few weeks earlier and had threatened Glasper in that conversation as well.

Lemke also revealed that a second witness, Warren Jones, had contacted him to complain about Powell's threatening behavior. Powell had used Jones address to receive tickets, and Jones had used some of the tickets himself. According to Lemke, Powell had called Jones and told Jones that if he testified as he had planned, Powell would reveal that Jones was "perjuring" himself. Apparently, Powell believed that Jones receipt of the tickets had involved him in the scheme, and to say otherwise was "perjury."

Postal Inspector Fox testified also. Fox had spoken with Glasper's sister, Edna Polk. She told Fox that Powell had called her in a very excited state and blamed her brother for Powell's inability to spend Christmas with his son. Fox offered the further information that the prison had recorded all of the collect phone calls Powell made from the prison, including his call to Glasper. Apparently aware of the prison's ability to trace prisoner's phone calls, Powell used an elaborate ruse in an attempt to hide his call to Glasper: Powell broke into another inmate's call to his girlfriend and asked her to place a third party call to Glasper. Obviously, his efforts to hide the

call failed, although the government had to go to some extra effort to find the call.

■■■ Powell believes that the court denied his right to due process by sentencing him based on this hearsay testimony without any indication as to why the declarants were unavailable. Powell's argument appears based on an erroneous belief that his Sixth Amendment right to confront witnesses extends to the sentencing portion of his trial: it does not. *United States v. Hershberger*, 962 F.2d 1548, 1553–54 (10th Cir.1992). At sentencing, the trial court may consider hearsay statements with a "minimal indication of reliability." *Id.*, at 1554; *United States v. Beaulieu*, 893 F.2d 1177, 1181 (10th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 3302, 111 L.Ed.2d 811 (1990). A showing of unavailability, of course, does not increase a hearsay statement's reliability.

■■■ We further find, contrary to Powell's unsupported assertion, that the statements of the postal inspectors were imbued with sufficient indicia of reliability. As in *Reid*, "[o]nly when the witness complained to the government did the government become involved." *United States v. Reid*, 911 F.2d 1456, 1464 (10th Cir.1990). The prison taped some of the calls in question, and apparently the transcripts of those conversations were available, and referred to by Powell's counsel, during the sentencing. The postal inspectors' testimony was consistent with those tapes, and with the typed transcripts of their interviews with the complaining witnesses, which were also available.

■■■ Powell also argues that this evidence could not support an adjustment for obstruction of justice because he did not threaten the witnesses. *See* U.S.S.G. 3C1.1.[6] Again Powell ignores the plain intent of the law. "Threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so" is specifically among the types of conduct to which

---

6. U.S.S.G. 3C1.1 provides:
   If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the

administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

this enhancement applies according to the Commentary to the Guideline. U.S.S.G. 3C1.1 Application Note 3(a). A defendant need not actually threaten the witness; he need only attempt to influence them. This is what the court found Powell did. This finding is not clearly erroneous.

## IV.

For the reasons stated above, we AFFIRM all of Powell's convictions and his sentence for those crimes.