**UNITED STATES of America,
Plaintiff,**

v.

**Terry Lynn NICHOLS, Defendant.**

**No. 96–CR–68–M.**

United States District Court,
D. Colorado.

Sept. 13, 1999.

Patrick M. Ryan, U.S. Attorney, Oklahoma City, OK, Sean Connelly, Assistant U.S. Attorney, Denver, CO, for plaintiff.

Michael Tigar, Jane B. Tigar, Washington, DC, Ronald G. Woods, Houston, TX, Adam Thurschwell, Cleveland, OH, Susan Foreman, Boulder, CO, for defendant.

## MEMORANDUM OPINION AND ORDER ON MOTION FOR NEW TRIAL

MATSCH, Chief Judge.

Terry Nichols seeks a new trial because the prosecution lawyers did not review approximately 50,000 pieces of paper generated by the FBI during the course of its investigation of the bombing of the Alfred P. Murrah Building in Oklahoma City on April 19, 1995. These papers are officially described as "information control" sheets and informally called "lead sheets."

Routinely, FBI agents and other FBI personnel use a standard form, in triplicate, to record received information that may possibly be relevant to an investigation, identifying the source, method, date and time of contact and a narrative summary of what was heard from the source. This form is also used to document communications between agents. Each lead sheet is given a control number and the form provides a space for reporting what investigative steps were taken as a result of the information received or the agent's

message. If the follow-up to the lead is an interview of the source or of others who may have more information, the agent conducting the interview will report what was said on a Form 302 if the information is thought to be relevant to the investigation or in the form of an "insert" if the information is of no apparent value.

Defense counsel first became aware of the existence of these lead sheets on December 11, 1997 during the testimony of FBI Agent Budke, who said that he had written a lead sheet after he encountered Sergeant Richard Wahl at a McDonald's restaurant in Junction City, Kansas and that Sgt. Wahl said he had seen a Ryder truck and a gray pick-up truck at Geary State Park on the morning of April 18, 1995. Agent Budke gave this lead sheet dated April 26, 1995 to Agent Schaefer who then interviewed Sgt. Wahl and wrote a Form 302 report of that interview, reporting that Sgt. Wahl had described the pick-up as blue or brown in color. A lead sheet, dated April 22, 1995, revealed that "Rick Wahl" had called the FBI 800 number on that date, reporting that he had seen a "late model Chevy truck" alongside a Ryder truck at the Geary State Fishing Park on the morning of April 18. Sgt. Wahl had testified as a government witness on November 20, 1997 and the government relied heavily on his testimony in support of the contention that Mr. Nichols met with Timothy McVeigh to mix bomb components at that location on the morning before the bombing.

Government counsel Mackey obtained a copy of Agent Budke's lead sheet which was then marked defendant's exhibit D1890 and introduced in evidence together with the 302 report of interview, the lead sheet of the telephone call, and the transcript of the grand jury testimony of the witness Wahl, enabling the jury to consider all of these variations in assessing the credibility of the witness.

A defense motion for mistrial was denied. Mr. Mackey said that government counsel had not been aware of the lead sheets and therefore had not reviewed them for compliance with the discovery agreement and the duty to disclose under *Brady*. The court denied the defense demand for production at that time and said that the entire subject of the lead sheets could be raised in a motion for new trial under Fed.R.Crim.P. 33.

On February 9, 1998, the defense filed motions under Rules 29, 33 and 34. At a hearing on February 17, 1998, Mr. Mackey reported that government counsel had made a first review of the 50,000 lead sheets in the possession of the FBI and concluded that they could be divided into three categories. These were characterized as (1) "agent-to-agent" communications, (2) calls received at an FBI 800 telephone number from persons offering lay opinions about the possible identities of the men depicted in two composite drawings of possible perpetrators, called John Doe #1 and John Doe #2, which had been widely circulated in public media, and (3) a general category of "everything else." The court declined to delay sentencing for the time that would be required for a comprehensive review of the lead sheets.

At a subsequent hearing on March 25, 1998, defense counsel asked for production of all of the lead sheets, then estimated at 40,000 pages, noting another document had surfaced during the testimony of Mr. Dilly, in the trial's penalty phase on December 31, 1997. Mr. Mackey objected to that request, saying that more than 28,000 witness statements were produced to the defense during discovery as well as all of the grand jury testimony, lab notes and many other records and that all of the 302 reports and inserts resulting from the investigation of all leads were given to the defense. Mr. Mackey reported that he had instructed FBI agents to sort all of the lead sheets into the three categories identified at the February 17 hearing and that a group of 12,000 sheets in the third category were then reviewed by the lawyers on the prosecution team. Mr. Mackey said that the prosecutors concluded that

there was no *Jencks* or *Brady* material in them.

The court directed that all 12,000 pages that had been reviewed by the government lawyers be turned over to the defense team after redacting the information as to the investigative responses undertaken. The court denied the defense motions and proceeded with the sentencing of Mr. Nichols, suggesting that the defense may use the lead sheet material in a post-judgment motion.

That motion was filed on January 25, 1999, asserting that Mr. Nichols was entitled to a new trial because the government had deliberately withheld and concealed exculpatory evidence and discovery materials tending to support Mr. Nichols' innocence in violation of the constitutional duty to disclose under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny. Defense counsel reported that the lead sheets turned over as a result of the court's March 25, 1998 order had been examined by an investigator and paralegal under the direction of defense counsel. Submitted with the motion, under seal, were 65 items claimed to be exculpatory, directly relevant to trial themes and issues and not disclosed in any form. A summary of those items was included in the motion. Copies of the lead sheets were submitted under seal.

The defense contends that if this information had been provided before the trial there may have been a greater opportunity to cast doubt on the government's theory of the case and to mitigate the sentence by minimizing the defendant's role in the conspiracy. More particularly, it is argued that these lead sheets suggest the involvement of other perpetrators because of reported sightings of people with Timothy McVeigh at times relevant to the case; that someone other than Mr. Nichols burglarized the Martin–Marietta quarry, stealing explosives; that Mr. Nichols did not rob Roger Moore and that Mr. Nichols did not mix the bomb with Timothy McVeigh at Geary State Park on April 18, 1995. Additionally, the defense contends that the missing material may have cast doubt on the evidence showing purchases of ammonium nitrate fertilizer by Mr. Nichols, under assumed names, and the storage of it and other bomb components in assistance of Mr. McVeigh.

The government's response, filed March 4, 1999, argued that the allegedly new information had been available to the Nichols defense team in other forms before trial, that it is no more than cumulative of other known information and that it is immaterial. The response reported that 13,998 Bates-stamped pages of lead sheets had been turned over, with redactions, as ordered by the court, and that with some clarification about numbering, the defendant's motion involved only 62 lead sheets. To show that a majority of those sheets referred to information made available in the 302 reports and inserts provided in discovery, the government submitted, under seal, those lead sheets and the corresponding reports said to contain the same information. The government submitted an item-by-item comparison of the documents.

Government counsel argued that they followed the direction given by this court in defining the prosecution's duty in ruling on a variety of discovery-related motions in *United States v. McVeigh*, 954 F.Supp. 1441, 1448–49 (D.Colo.1997):

> The task of the prosecution is to collect and collate the information developed during the investigation and to construct a coherent interpretation of it, forming a narrative explaining what happened, who was involved and why the perpetrators acted as they did. The prosecutors must then sort out what can be supported by admissible evidence from what is suspected, but not provable, and then define their case by writing the indictment. Due process requires them to give fair notice to the accused of what the government intends to prove. It also requires fairness in the methods of proof, using the rules of evidence. Trial advocates must adhere to professional ethics. The accused

must be afforded the protection of effective assistance of counsel. And, finally, evidence must be presented to a fair-minded jury under the adversary system of trial.

There is no requirement that the government present all of the information known to it that can meet the requirements for admissible evidence. The prosecutors may be selective and use only that which they believe will have persuasive effect on the jury. *What they may not do is suppress or secrete information known to them which does not fit into the narrative, or which contradicts the evidence used to support that narrative, or which may diminish the credibility of the evidence relied on to tell the story.* Stated simply, the prosecutors must not present proof of an historical narrative that they know not to be true. They must disclose to the defense the information known to or available to them which may develop doubt about the truth of the government's narrative. (emphasis added).

In a reply filed on April 15, 1999, the defense conceded that much of the information was contained in the interview reports given in discovery but contended that the court should set an evidentiary hearing because of asserted contradictions, citing specific references. A supplemental memorandum was filed by the defense on April 28, 1999, attaching as Exhibit A a lead sheet saying that Michael Fortier said that Timothy McVeigh purchased racing fuel at a racetrack in Kingman, Arizona and had rented his own shed there.

The motion for new trial was heard on July 7, 1999. At that hearing Mr. Connelly correctly observed that the lead sheet was an agent-to-agent communication, that Mr. Fortier was not the source, that the date was before Mr. Fortier agreed to cooperate, still giving false information and that follow-up investigation determined that no racetrack near Kingman sold fuel.

The defendant's motion for new trial is also based on a letter the court received from Roger Moore, who testified at trial,

complaining of the government's failure to return property seized as evidence and stating his perceptions of the manner in which government counsel had interviewed him. Those interviews were not the subject of FBI 302 reports because they were done by counsel in the course of preparation for trial. There is nothing in Mr. Moore's letter or other material submitted in connection with it that constitutes a *Brady* violation or a failure to comply with discovery requirements.

At the motion hearing defense counsel emphasized the scope of the *Brady* obligation defined by the Supreme Court in the recent opinion in *Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). There, in a habeas corpus case, the Court reviewed its decisions in *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) holding that any favorable evidence known to those acting on the government's behalf must be produced even if unknown to the prosecuting attorney, who is by law charged with such knowledge, and in *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) holding that the duty of disclosure includes impeachment as well as exculpatory evidence and defining materiality. The Court in *Strickler* repeated the standard for determining the materiality of evidence withheld under *Brady* directing the reviewing court to determine "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 527 U.S. at ——, 119 S.Ct. at 1948 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

Government counsel themselves do not know what is in the lead sheets in the two categories that they have not read relying on the assigned FBI agents to follow the directions given to them.

At the hearing on July 7, 1999, Mr. Connelly described the review process used by government counsel and the FBI agents assigned to the review of the lead sheets. He stated that Agent White, who

was directly involved in the investigation from the beginning, supervised between eight and ten agents in examining these sheets according to instructions from counsel and that there was continuing interaction with counsel on specific items. Mr. Connelly argued that proof of compliance with the general instruction that the agents should resolve any doubts in favor of production is shown by the production of sheets 659, 931 and 11903, which, he suggests, should have been considered agent-to-agent communications.

■ In *Strickler*, the Supreme Court also reaffirmed the test for determining the materiality of withheld information established in *Bagley*. The *Bagley* Court restated the constitutional principle that is the predicate for *Brady* in these words:

The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial[.]

473 U.S. at 675, 105 S.Ct. 3375 (footnotes omitted).

The Tenth Circuit Court of Appeals, in *Smith v. Secretary of New Mexico Dep't of Corrections*, 50 F.3d 801 (10th Cir.1995), drew a distinction between the discovery rules and the prosecutor's constitutional duty of disclosure and followed the *Bagley* standard in vacating a state court murder conviction in a habeas corpus proceeding. The court stated:

In making the materiality determination, "we view the suppressed evidence's significance in relation to the record as a whole," *Hughes*, 33 F.3d at 1252 (citing *United States v. Wolf*, 839 F.2d 1387, 1391 (10th Cir.), *cert. denied*, 488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988)), keeping in mind that "[w]hat might be considered insignificant evidence in a strong case might suffice to

disturb an already questionable verdict." *Robinson*, 39 F.3d at 1119 (citing *Agurs*, 427 U.S. at 113, 96 S.Ct. at 2402). We are also to consider "any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case ... in light of the totality of the circumstances." *Bagley*, 473 U.S. at 683, 105 S.Ct. at 3384.

50 F.3d at 827.

■ The request for the production of all of the lead sheets and for an evidentiary hearing or an alternative discovery procedure must be considered in the context of the investigations conducted by the government and the defense. Other federal agencies and local law enforcement offices were involved. A complete review of every piece of paper generated by the many offices and agents concerned with this matter is an impossible task. There are reasonable limits to the search for possible leads to evidence and the defense requests exceed those limits. In reaching this conclusion, the court is aware that the defense team was provided with ample resources to conduct an independent investigation and presented a vigorous defense, calling 92 witnesses and introducing more than 400 exhibits to cast doubt on the government's case against Mr. Nichols.

The motion for new trial must be denied because the defense has failed to show prejudice from the failure of the government to produce these lead sheets before trial. There is nothing presented here that would support a finding of a reasonable probability that the jury verdict or the sentence would have been different if they had been given to the defense before or during trial.

A review of the closing arguments by the government and defense counsel supports this conclusion. The government sought conviction on all counts by arguing that the evidence showed that Timothy McVeigh started on a "road to destruction" in September 1994, and that Mr. Nichols was with him "every step of the way." A demonstrative chart was dis-

played to illustrate these steps: a purchase of one ton of ammonium nitrate fertilizer under an assumed name on September 30, the theft of explosives from the Martin–Marietta quarry on the weekend of October 1–2, the purchase of a second ton of ammonium nitrate fertilizer on October 18, accompanying Mr. McVeigh on a trip to Texas for the purchase of 3 barrels of nitromethane racing fuel, the robbery of Roger Moore in Arkansas on November 5, the renting of storage sheds under assumed names, the drive to Oklahoma City on April 16 to place the getaway car and assisting in mixing the bomb components on April 18. The defense arguments countered extensively with suggested contradictions and doubts about the evidence at each step, emphasizing the testimony on cross-examination of government witnesses and the evidence introduced by the defense.

The court recognized the differences in the evidence as to Timothy McVeigh and Terry Nichols in granting separate trials, in different evidentiary rulings and jury instructions in the two trials. The Nichols jury verdict shows that the jury did not accept the entire narrative suggested by the government. Upon the foregoing, it is

ORDERED that the motion for new trial is DENIED.